UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JANET HARVEY *and* JOSEPH HARVEY,

                    Plaintiffs,

            – *against* –

PERMANENT MISSION OF THE
REPUBLIC OF SIERRA LEONE TO THE
UNITED NATIONS, EMPIRE GROUP
NYC, LLC, DAVID I MONTESI, JULES
DAVIS, *and* FAIRFIELD CONSTRUCTION
ASSOCIATES, LLC,

                    Defendants.

**OPINION & ORDER**

21 Civ. 4368 (ER)

RAMOS, D.J.:

Janet and Joseph Harvey filed this action on May 14, 2021 and filed an amended complaint on October 22, 2021. Docs. 1, 100. Plaintiffs bring various common law claims alleging that the renovation and expansion of the Permanent Mission of the Republic of Sierra Leone ("the Mission"), which is located next door to their home in Manhattan, pose a danger to their health. *Id.*

The Court entered a consent order in this matter between the plaintiffs and defendants Empire Group NYC and David Montesi on June 7, 2021. Doc. 38. The consent order required Empire and Montesi to address certain safety issues with the property. *Id.*

The Mission filed a motion to dismiss on December 14, 2021 for lack of subject matter and personal jurisdiction and failure to state a claim. Doc. 138. For the reasons set forth below, the motion to dismiss is DENIED.

Plaintiffs also moved on the same day for (1) contempt and sanctions against Empire and Montesi related to violations of the consent order, Doc. 38, and (2) a preliminary injunction

against all defendants.  Doc. 140.  For the reasons set forth below, the motion for contempt and sanctions is DENIED in part and the motion for a preliminary injunction is DENIED.

## I.      BACKGROUND[1]

The following facts are based on the allegations in the complaint, which the Court accepts as true for purposes of the motion to dismiss.  *See, e.g.*, *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

The Harveys are married and own a townhouse at 243 East 49th Street in Manhattan, where they live with their daughters.  ¶ 11.

The Mission is the delegation to the United Nations from Sierra Leone.  ¶ 12.  It owns the townhouse directly next to the Harveys at 245 East 49th Street, and the two townhomes share a "party wall."  *Id.*; ¶ 22.  The townhouse is used as the Mission headquarters.  ¶ 22.  The Mission began renovating and adding two new floors to its headquarters in 2019.  ¶ 23.

Fairfield is the general contractor for renovations at the Mission building and is headquartered in New York.  ¶¶ 14, 25.  Jules Davis leads Fairfield's work at the Mission.  ¶ 25.[2] Empire is Fairfield's subcontractor which has performed substantially all of the renovations at the Mission and is headquartered and incorporated in New York.  ¶¶ 13, 25.  Montesi is President of Empire.[3]  ¶ 13.  Montesi has led Empire's work at the headquarters and received permits from the New York City Department of Buildings ("DOB") to conduct the renovations. *Id.*; ¶ 23.

---

[1] Unless otherwise indicated, all references to "¶ ___" refer to the amended complaint, Doc. 100.

[2] Fairfield and Davis together will be referred to as "the Fairfield defendants."

[3] Empire and Montesi together will be referred to as "the Empire defendants."

Despite having been started in 2019, the renovations at the Mission are incomplete—the two additional floors are not fully built, there is an exposed elevator shaft, and at times the building contained flammable debris.  ¶ 24.  The incomplete renovations have created a variety of dangerous conditions at the site, including the presence of flammable materials, threats to structural integrity, risk of carbon monoxide poisoning, lack of protective structures, and water infiltration of the Harveys' home.  ¶¶ 28–51.  The Harveys bring claims alleging negligence, private nuisance, and trespass against all defendants.  ¶¶ 56–76.

On June 7, 2021, the Court entered a consent order in this matter directing the Empire defendants[4] to work with the Harveys to remedy certain of the alleged deficiencies with the renovation.  Doc. 38.  Among other things, the order requires the Empire defendants to create and apply for approval for plans for a temporary chimney extension to be installed on the Harveys' home, to remove certain debris inside the Mission property, to ensure entry and egress from the street, and to enclose elevator shaft openings.  *Id.*  Notably, the order concluded as follows:

> So long as Defendants make reasonable best efforts to obtain the necessary approvals or authorizations from the Mission and inform Plaintiffs of their efforts, Defendants shall in no way be prejudiced or held at fault by the failure of the Mission to act and/or provide authorizations where required for Defendants to comply with this Consent Order[.]

*Id.*

The Mission moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2), and 12(b)(6), for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim on December 14, 2021.  Doc. 138.

---

[4] Only defendants Empire and Montesi are parties to that consent order with the Harveys, as the other defendants had not yet appeared.

On the same day, plaintiffs moved for (1) contempt and sanctions against Empire and

Montesi related to violations of the consent order, Doc. 38, and (2) a preliminary injunction

against all defendants.  Doc. 140.

## II.    MOTION TO DISMISS LEGAL STANDARD

### A.  12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) requires that an action be dismissed for lack of

subject matter jurisdiction when the district court lacks the statutory or constitutional power to

adjudicate the case.  Fed. R. Civ. P. 12(b)(1).  The party asserting subject matter jurisdiction

carries the burden of establishing, by a preponderance of the evidence, that jurisdiction exists.

*Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v.*

*United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  On a Rule 12(b)(1) motion challenging the

district court's subject matter jurisdiction, evidence outside of the pleadings may be considered

by the court to resolve the disputed jurisdictional fact issues.  *Zappia Middle E. Constr. Co. v.*

*Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000) (citation omitted); *see also Morrison*,

547 F.3d at 170 (citing *Makarova*, 201 F.3d at 113).  When evaluating a motion to dismiss for

lack of subject matter jurisdiction, the court accepts all material factual allegations in the

complaint as true but does not necessarily draw inferences from the complaint favorable to the

plaintiff.  *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004) (citing *Shipping*

*Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).

Where, as here, a party also seeks dismissal on Rule 12(b)(6) grounds, the court must

consider the Rule 12(b)(1) motion first, *Baldessarre v. Monroe-Woodbury Cent. Sch. Dist.*, 820

F. Supp. 2d 490, 499 (S.D.N.Y. 2011), *aff'd*, 496 F. App'x 131 (2d Cir. 2012) (citations

omitted), because "disposition of a Rule 12(b)(6) motion is a decision on the merits, and

4

therefore, an exercise of jurisdiction." *Chambers v. Wright*, No. 05 Civ. 9915 (WHP), 2007 WL 4462181, at *2 (S.D.N.Y. Dec. 19, 2007) (quoting *Magee v. Nassau Cnty. Med. Ctr.*, 27 F.Supp.2d 154, 158 (E.D.N.Y. 1998)).

### B.   12(b)(2)

"A plaintiff opposing a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction has the burden of establishing that the court has jurisdiction over the defendant." *BHC Interim Funding, LP v. Bracewell & Patterson, LLP*, No. 02 Civ. 4695 (LTS), 2003 WL 21467544, at *1 (S.D.N.Y. June 25, 2003) (citing *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)).  To meet this burden where there has been no discovery or evidentiary hearing, the plaintiff must plead facts sufficient for a *prima facie* showing of jurisdiction.  *Id.*  As the Court evaluates a Rule 12(b)(2) motion, it must construe all of the plaintiff's allegations as true and resolve all doubts in its favor.  *Casville Invs., Ltd. v. Kates*, No. 12 Civ. 6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)).  "However, a plaintiff may not rely on conclusory statements without any supporting facts, as such allegations would 'lack the factual specificity necessary to confer jurisdiction.'"  *Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14 Civ. 3756 (LGS), 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014) (quoting *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998)).  As Rule 12(b)(2) motions are "inherently . . . matter[s] requiring the resolution of factual issues outside of the pleadings," courts may rely on additional materials outside the pleadings when ruling on such motions.  *John Hancock Prop. & Cas. Ins. Co. v. Universale Reinsurance Co.*, No. 91 Civ. 3644 (CES), 1992 WL 26765, at *1 n.1 (S.D.N.Y. Feb. 5, 1992); *accord Darby Trading Inc. v. Shell Int'l Trading and Shipping Co.*, 568 F. Supp. 2d 329, 334 (S.D.N.Y. 2008).

### C.  12(b)(6)

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Christie's Int'l PLC*, 699 F.3d at 145.  However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

### III.    MOTION TO DISMISS

#### A.  Subject Matter and Personal Jurisdiction

The Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. § 1602 *et seq.*, provides the exclusive basis for obtaining subject matter jurisdiction over a foreign state.  *See* 28 U.S.C. § 1604 *et seq.*; *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989); *Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 83 (2d Cir. 2013) ("The only source of subject matter jurisdiction over a foreign sovereign or its instrumentalities in the courts of the United States is the FSIA[.]").  The FSIA also confers personal jurisdiction.  *See* 28 U.S.C. §§ 1330(a), 1330(b).  Under the FSIA, a foreign sovereign is immune from suit in federal

court unless a statutory exception applies.  *See* 28 U.S.C. § 1604; *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 610–11 (1992).

> [A]fter a defendant presents a *prima facie* case that it is a foreign sovereign, the plaintiff has the burden of . . . showing that under the FSIA's exceptions the defendant lacks immunity.  The district court reviews the allegations in the complaint and any undisputed facts supplied by the parties.  The ultimate burden of persuasion by a preponderance of the evidence nevertheless remains with the alleged foreign sovereign.

*Virtual Countries, Inc. v. Republic of S. Afr.*, 300 F.3d 230, 241–42 (2d Cir. 2002).

The parties do not dispute that the Mission is a foreign state.  Therefore, the Harveys must show that an exception applies.  The three exceptions at issue in the instant matter are the commercial activity exception, the immoveable property exception, and the non-commercial tort exception.  The Court will examine each exception in turn.

### a.  Commercial Activity Exception

The FSIA contains an exception for commercial activity.  *See* 28 U.S.C. § 1605(a)(2); *Kato v. Ishihara*, 360 F.3d 106, 108 (2d Cir. 2004).  The exception provides that foreign states will not enjoy immunity in any case "based upon a commercial activity carried on in the United States by the foreign state."  28 U.S.C.  § 1605(a)(2).  A foreign sovereign engages in commercial activity for FSIA purposes where it "exercises only those powers that can also be exercised by private citizens, rather than those powers peculiar to sovereigns."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 350 (1993) (citation omitted); *Weltover*, 504 U.S. at 614 (explaining that in order to identify "commercial activity" for FSIA purposes, courts must ask whether "the particular actions that the foreign state performs . . . are the *type* of actions by which a private party engages in trade and traffic or commerce") (emphasis in original, citation omitted).  The commercial activity exception has been interpreted broadly, but courts have required a significant nexus between the commercial activity and a plaintiffs' cause of action.  *See De*

*Letelier v. Republic of Chile*, 748 F.2d 790, 797 (2d Cir. 1984) (citation omitted); *NYSA–ILA Pension Trust Fund v. Garuda Indonesia*, 7 F.3d 35, 38 (2d Cir. 1993) (citations omitted).

The Harveys argue that the exception applies because the Mission engaged in commercial activity when it entered into a contract to renovate its headquarters.  The Harveys rely on *Napolitano v. Tishman Constr. Corp.*, No. 96 Civ. 4402 (SJ), 1998 WL 102789, (E.D.N.Y. Feb. 26, 1998), in which the court rejected Austria's argument that it was immune under the FSIA from an action for personal injuries sustained by a construction worker hired to renovate one of its consulate buildings in New York City.  The court held that the commercial activity exception applied because Austria's commercial activity in contracting to renovate its consulate led to the plaintiff's injuries.  *Id.* at *4.  Further, the *Napolitano* court held that the legislative history of the FSIA indicates that contracts "for the repairs of an embassy building or for the construction of a government building fall under the definition of commercial activity."  *Id.* at *3 (citing *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 923 (D.C. Cir. 1987)).  Here, the Harveys have alleged that "[t]his action arises from the Defendants' unlawful and incompetent efforts to renovate and expand the Mission's headquarters[.]"  ¶ 1.  Further, the complaint alleges specific actions by the Mission that have contributed to the renovation problems.  ¶¶ 47–51 (Defendants, including the Mission, failed to waterproof the roof); ¶ 52 (the Mission unlawfully encroached on Plaintiffs' property).

In response, the Mission argues that, as alleged in the complaint, this action is not focused on commercial activity but rather Sierra Leone's "running [of] the Mission."  ¶ 18.  Since running an embassy is not a commercial activity, *see S & S Mach. Co. v. Masinexportimport*, 802 F. Supp. 1109, 1112 (S.D.N.Y. 1992), the Mission argues that the Harveys have not properly alleged commercial activity sufficient to strip it of immunity.  The

Mission relies on *MacArthur Area Citizens Ass'n*, 809 F.2d 918, which held that Peru's use of a

building as a chancery, which allegedly violated local zoning laws, was governmental and not

commercial for purposes of FSIA immunity.  Further, if the renovations themselves could be

considered a commercial activity, it argues that such activities are alleged to be carried out by the

Fairfield and Empire defendants, not the Mission, and therefore there is no basis to impute the

actions to the Mission.  Although the Harveys allege that Fairfield and Davis are agents acting on

behalf of the Mission, ¶ 25, the Mission argues that their activities cannot be imputed to it.  It

further argues that there is not a "significant nexus" between the claims and the Mission's

contracts with the other defendants because, unlike in *Napolitano*, plaintiffs do not have a

commercial relationship with the Mission.

The Mission's reading of the complaint as referring only to the "running" of the Mission

is too restrictive.  The complaint clearly refers to numerous issues with and claims arising out of

the physical renovations of the Mission, which, as in *Napolitano*, are commercial activities.

1998 WL 102789, at *4.  As to the substantial nexus, again as in *Napolitano*, "[i]t is the

commercial activity of [the Mission] that led to Plaintiffs['] injuries.  Therefore, there is a

significant nexus[.]"  *Id.*  The fact that it is the Mission's neighbors instead of an employee of the

contractor that have been injured does not alter the analysis.  Further, another court in this district

has held that actions related to contractual renovations of a Mission fall under the commercial

activity exception.  *See Hilt Constr. & Mgmt. Corp. v. Permanent Mission of Chad to the United

Nations in New York*, No. 15 Civ. 8693 (VB), 2016 WL 3351180, at *4 (S.D.N.Y. June 15,

2016).  Therefore, the commercial activity exception applies, and the Mission is not immune.

### b.  Immoveable Property Exception

In the alternative, the Harveys argue that the immoveable property exception strips the Mission of its immunity.

Section 1605(a)(4) of Title 28 provides an exception to FSIA immunity where "rights in immovable property situated in the United States are in issue." This exception "focuses . . . broadly on rights in property" and "does not expressly limit itself to cases in which the specific right at issue is title, ownership, or possession." *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 198 (2007) (internal quotation marks omitted) (holding that an action determining the validity of a tax lien triggered this exception because a tax lien inhibits the right to convey property); *see also Eisenberg v. Permanent Mission of Equatorial Guinea to United Nations*, 832 F. App'x 38, 39–40 (2d Cir. 2020) (holding that suit alleging trespass and cloud on title related to features installed on the Mission's neighboring property falls within the immovable property exception because it implicates the right to convey property).

The Second Circuit has stated that:

Ownership of property connotes a bundle of related rights and obligations defined by local property law. A foreign state cannot assume the benefits of ownership—including the right to exclude others from the property with the assistance of the local government and, significantly, the right to sue those who violate its rights—while simultaneously disclaiming the obligations associated with them. When owning property abroad, a foreign state must follow all the same laws that pertain to private owners of such property, except to the extent that it can point to specific exceptions in that country's agreements with the United States, treaties, or other sources of law. This principle—when owning property here, a foreign state must follow the same rules as everyone else—long predated the restrictive theory of sovereign immunity and the FSIA. We see no evidence that the FSIA was meant to alter it. We conclude that the "immovable property" exception to foreign sovereign immunity should be construed to include any case where what is at issue is: (1) the foreign country's rights to or interest in immovable property situated in the United States; (2) the foreign country's use or possession of such immovable property; or (3) the foreign country's obligations arising directly out of such rights to or use of the property.

*City of New York v. Permanent Mission of India to the United Nations*, 446 F.3d 365, 373–74 (2d Cir. 2006), *aff'd and remanded*, 551 U.S. 193 (2007) (internal citation omitted).

The Harveys argue that the Construction Code is a New York property law which regulates property owners' use of their land, and just as New York can enforce liens against foreign states, it can also enforce the Construction Code.  In support, they point to the fact that violations for failure to comply with the Construction Code run with the land, as the exception requires, and appear in property title searches and can prevent an owner from selling the property since the DOB will not issue new certificates of occupancy while violations remain active.  *See* Dep't of Buildings, *Resolve a Summons or Violation*, *DOB Violations*, found at https://www1.nyc.gov/site/buildings/dob/resolve-a-summons-or-violation.page (last visited Apr. 12, 2022).  Since they have alleged several violations of the Construction Code against the Mission, e.g., a failure to add a chimney extension, ¶¶ 29–31, a failure to protect the shared party wall, ¶¶ 40–46, and a failure to install waterproofing, ¶¶ 47–51, the Harveys argue that their claims concern the Mission's property rights.

The Harveys attempt to distinguish *MacArthur*, a case from the D.C. Circuit, in which the court found that the immovable property exception did not apply because the plaintiffs' claim did not seek to establish any rights in Peru's chancery building but rather brought a damages claim sounding in nuisance for violation of local zoning laws.  *MacArthur*, 809 F.2d at 921.  The Harveys argue that, unlike the *MacArthur* plaintiffs, they share a party wall with the Mission and thus have an interest in the property, as alleged in their claims regarding water seeping into their home through the party wall.  ¶¶ 40–46.  Further, Peru was never found in violation of the zoning ordinance, whereas here, the DOB has found the Mission in violation of the Construction Code multiple times.  ¶¶ 29–31, 35–39.

The Mission argues that the claims at issue are for "standard tort liability," which do not satisfy the immovable property exception. *See, e.g.*, *Permanent Mission of India*, 551 U.S. at 200–01 (stating that immunity would apply to claims incidental to property ownership such as actions involving an injury suffered in a fall on the property, as compared to eminent-domain proceedings for which there would be no immunity because the lawsuits directly implicate rights in property). It argues that the tort claims here do not directly implicate the property rights of either party, unlike in *Eisenberg* where the immovable property exception was at issue because the foreign state had installed permanent structures that allegedly trespassed on plaintiffs' property and the plaintiffs sought a declaration to quiet title. 832 F. App'x at 40–41.

Though it is a close call, the Court finds that the immovable property exception does not apply here.[5] The Harveys bring claims sounding in standard torts (nuisance, trespass, negligence). While the Harveys argue that their claims could ultimately have some impact on the Mission's property rights through enforcement of the Construction Code,[6] any such impact would be tangential to the case at hand, as the Harveys have not brought any claims such as the quiet title claim in *Eisenberg* that could encumber the property. Therefore, this matter is closer to *MacArthur* than *Eisenberg*.

### c. Tortious Act Exception

Lastly, the Harveys argue that the tortious act exception under 28 U.S.C. § 1605(a)(5) also strips the Mission of its immunity.

---

[5] As discussed above, the Court notes that the commercial activity exception alone is sufficient to strip the Mission of its immunity.

[6] In light of the doctrine of inviolability, discussed below, the Court is not convinced that the Mission's rights in the property could be impacted even in an action directly targeting the Mission's property rights.

Section 1605(a)(5) denies immunity in cases "in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state[.]"  "Federal jurisdiction under this FSIA exception to immunity exists, then, only if (i) the plaintiff claims some injury caused by the tortious act or omission of a foreign state; and (ii) this act or omission was non-discretionary."  *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 139–40 (2d Cir. 2001) (quotation marks omitted).  To determine whether an alleged action is a tort, courts apply "the law of the state in which the locus of injury occurred—here, New York Law."  *Swarna v. Al-Awadi*, 622 F.3d 123, 144 (2d Cir. 2010).  An act or omission is discretionary if:  "(1) the acts . . . involve an element of judgment or choice and are not compelled by statute or regulation, and (2) the judgment or choice in question [is] grounded in considerations of public policy or susceptible to public policy analysis."  *USAA Cas. Ins. Co. v. Permanent Mission of Republic of Namibia*, 681 F.3d 103, 111–12 (2d Cir. 2012) (internal quotation marks and citation omitted).  "Congress' primary purpose in enacting § 1605(a)(5) was to eliminate a foreign state's immunity for traffic accidents and other torts committed in the United States, for which liability is imposed under domestic tort law."  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439–40 (1989) (citation omitted).

The Harveys argue that they have sufficiently alleged non-discretionary claims of negligence, nuisance, and trespass against the Mission.  The Court will examine each claim in turn.

### i.  Negligence

To state a claim of negligence under New York law, a plaintiff must show "(1) that [defendant] owed [ ] a duty, or obligation, recognized by law, (2) a breach of the duty, (3) a

reasonably close causal connection between [defendant's] conduct and the resulting injury and (4) loss or damage resulting from the breach." *McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997) (internal quotation marks omitted) (citing *Becker v. Schwartz*, 386 N.E.2d 807 (N.Y. 1978)).  The Harveys argue that the Mission owed a duty to Plaintiffs because "failure to comply with a duty imposed by the Building Code is . . . evidence of negligence and can give rise to tort liability under New York law." *Namibia*, 681 F.3d at 109.  The Harveys have alleged that defendants failed to perform the renovations in conformity with the Construction Code and list multiple provisions of the code that they allege have been violated.  ¶¶ 57–60.  Four of those provisions are Building Code Section 3309.4 (protecting foundation of adjoining property from damage), Section 3309.8 (maintaining structural integrity of adjoining walls), Section 3309.10 (protection of roofs), and Mechanical Code Section 801.1.1.1 (responsibility of owner of taller building).  *Id*.

In *Namibia*, a comparable case concerning Namibia's alleged failure to reinforce the party wall between their Mission's property and the adjoining townhouse, the Second Circuit found that the Mission had a nondelegable duty to ensure the structural integrity of the party wall under Section 3309.8 of the Building Code.  681 F.3d at 109–11.[7]  The Second Circuit thus found that the failure to protect the wall would, if proven, constitute a tort within the meaning of the tortious activity exception.  *Id.* at 111.  Further, the action was non-discretionary as the regulation was mandatory.  *Id.* at 112.  Therefore, the tortious activity exception was triggered and Namibia was not immune under the FSIA.  *Id.*  The Harveys have alleged negligence under

---

[7] The Second Circuit held as such because these statutes are directed at "the person causing the construction . . . operation," which under New York law is defined to apply to the owner of the property who employs a third person to complete the construction. *USAA Cas. Ins. Co. v. Permanent Mission of Republic of Namibia*, 681 F.3d 103, 111 (2d Cir. 2012) (quoting Section 3309.8 of the Building Code).

the same provision here, in addition to negligence for violation of three additional provisions of the Building Code with the same non-delegable duty.  ¶¶ 37, 60.  Accordingly, *Namibia* is controlling and the same conclusion must be reached for Sierra Leone—it is not immune under the FSIA from negligence related to these four provisions.[8]

The Harveys alleged ten additional violations that do not contain the same non-delegable duties as these four provisions,[9] and the Mission argues that the Court does not have jurisdiction over those claims because the Mission delegated those duties to the contractors, meaning no claim can be brought against them concerning those alleged violations.  Specifically, the Mission argues that the duties regarding these provisions are delegable and therefore discretionary because they do not contain "a specific positive command" directed to the building's owner instead of a "nonspecific and general obligation."  *Namibia*, 681 F.3d at 111 (internal quotation marks and citations omitted).

A review of the remaining ten provisions reveals that eight of the ten provisions[10] are not mandatory towards the building owner and instead contain only general obligations and "shall" statements not directed at any particular party.  *See, e.g.*, Building Code Section 3303.4.4 ("All floors, roofs, and working decks shall be cleaned of debris at least daily[.]").   These eight

---

[8] The Mission's reliance on *MacArthur*, a D.C. Circuit case finding that renovations were discretionary, is not binding on this Court and, in any event, does not compel a different result.  "[T]he immunity accorded to [the Mission's discretionary] decision to . . . renovate the [b]uilding" does not "extend[ ] to the tort allegedly committed during its implementation of that decision."  *USAA Cas. Ins. Co. v. Permanent Mission of Republic of Namibia*, 681 F.3d 103, 113 (2d Cir. 2012).  Once the Mission decided to renovate the building, "it could not disregard the nondelegable duty of care imposed upon it by the New York City Building Code."  *Id.*

[9] The provisions are:  (1) Section 3303.4.4 (Control of debris), (2) Section 3303.4.5 (Storage of materials and equipment during construction or demolition), (3) Section 3303.4.5.1 (Securing materials in open and exposed areas), (4) Section 3304.5.2 (Storage near unenclosed perimeters), (5) Section 3309.1 (Protection of Adjoining Party from damage), (6) Section 3309.1.1 (Notification to adjoining property owners), (7) Section 3309.2 (License to enter adjoining property), (8) Section 3303.12.2 (Safety monitoring plan), (9) Mechanical Code Section 801.1.1.2 (Protection of draft), (10) Mechanical Code Section 801.1.1.3 (Written notification to affected adjoining properties).  Doc. 100 ¶ 60.

[10] That is, each of the above provisions except for Mechanical Code Section 801.1.1.2 and 801.1.1.3.

provisions require, for example, equipment to be tied down, removed, and properly stored, among other things.  While New York property owners owe a general duty to maintain premises in a reasonably safe condition, the duty is delegated to independent contractors unless (1) the owner engaged in negligent hiring or supervision, (2) the work is inherently dangerous, or (3) when the owner bears a specific non-delegable duty, such as those contained in the four provisions discussed above.  *Namibia*, 681 F.3d at 110 (citing *Robinson*, 269 F.3d at 145).  As discussed, the duty can be delegated.  However, the Harveys argue that they have alleged that the mission failed "to properly and adequately train, supervise, and/or inspect the work of their employees."  ¶ 57.  The Court disagrees, as this allegation in the complaint refers generally to the defendants and not to the Mission specifically and the Harveys have not otherwise presented any evidence of negligent hiring or supervision.  The Harveys further argue that the work is inherently dangerous, a fact which the Mission knows because of the warnings and stop work orders from the DOB.  However, the Harveys have not presented evidence that the renovations taking place at the Mission are inherently dangerous.  *See Farnsworth v. Brookside Const. Co.*, 818 N.Y.S.2d 386, 387 (N.Y. App. Div. 2006) (holding that construction of a home is not inherently dangerous).  Therefore, the duties associated with these eight provisions were delegated to the contractors and the Mission cannot be liable for a violation of these provisions. As to these eight provisions, immunity would thus apply.

Further, two of the ten provisions, Mechanical Code Section 801.1.1.2 and 801.1.1.3, do specifically require obligations from "the owner of the new or altered building."  Therefore, the same analysis as *Namibia* applies to these two additional provisions to strip the Mission of its immunity.  Specifically, the Mission has a nondelegable duty to comply with these two provisions of the Mechanical Code as they are the owner of the building, and failure to comply

with this provision would constitute a tort within the meaning of the tortious activity exception.
*See Namibia*, 681 F.3d at 111.  Further, the action is non-discretionary as the regulations are
mandatory.  *See id.* at 112; Mechanical Code § 801.1.1.2 ("it shall be the responsibility of the
owner . . ."); Mechanical Code § 801.1.1.3 ("The owner of the new or altered building shall
notify the owner . . .").

### ii.  Nuisance

To state a claim for private nuisance, a plaintiff must show that the conduct at issue "is a
legal cause of the invasion of the interest in the private use and enjoyment of land and such
invasion is (1) intentional and unreasonable, (2) negligent or reckless, or (3) actionable under the
rules governing liability for abnormally dangerous conditions or activities."  *Copart Indus., Inc.
v. Consol., Edison Co. of N.Y.*, 362 N.E.2d 968, 971 (N.Y. 1977); *see also Scribner v.
Summers*, 84 F.3d 554, 559 (2d Cir. 1996).  Here, the nuisance claim is based on negligence, and
as discussed above, the Harveys have stated a claim for negligence.  Further, the Harveys have
alleged that the Mission's actions have deprived them of the use of "significant portions" of their
home.  ¶ 5.  Therefore, the Harveys have stated a claim for nuisance and the tortious activities
exception is again triggered.[11]  *See Smith v. Vill. of Victor*, 236 N.Y.S. 566, 568 (N.Y. Sup. Ct.
1929) ("in actions where nuisance is based on negligence the rules applicable to negligence will
be applied").

### iii.  Trespass

"Under New York law, trespass is the intentional invasion of another's property."
*Scribner*, 84 F.3d at 557 (2d Cir. 1996) (citations omitted).  The complaint alleges only two

---

[11] Also, for the same reasons as above regarding the negligence claim, the actions are not discretionary.

instances of trespass that have already occurred[12]—that the Defendants "cause[d] agents . . . to walk on the Harveys' property and install scaffolding and equipment" without consent, ¶ 71, and that portions of the Mission "partially cover up the Harveys' exhaust pipes," ¶ 52.

The Mission argues that it cannot be held liable for its contractors' trespass because it neither "directed the trespass [nor was] such trespass . . . necessary to complete the contract," *Axtell v. Kurey*, 634 N.Y.S.2d 847, 848 (N.Y. App. Div. 1995), as required to impute the conduct to the owner.  The Mission argues that the Harveys have not alleged that personnel from the Mission committed trespass, nor that they directed anyone else to do so, nor that it was necessary to complete the contract.  Rather, the complaint states that the Fairfield defendants retained the Empire defendants as a subcontractor to oversee and perform the renovations.  ¶ 25.

The Harveys respond that they have alleged that it was the Mission's responsibility to obtain a license from them to enter their property, a responsibility that could not be delegated to contractors.  ¶ 60 ("Building Code Section 3309.2, 'License to enter adjoining property,' states: 'The responsibility of affording any license to enter adjoining property shall rest upon the owner of the adjoining property involved[.]").  Further, they have alleged that the alleged trespasses arose directly from the Mission's contracts with the contractors to conduct the renovations.  ¶ 25.

While it is not disputed that the Mission contracted with Empire and Fairfield to perform the renovations that led to the alleged trespasses, the Harveys have not sufficiently alleged that trespass was thus *necessary* to complete the contract as required by *Axtell*.  Nor is the Court satisfied that the Harveys have adequately alleged that the Mission directed the trespass.  Even if Building Code Section 3309.2 imposed a non-delegable duty on the Mission to obtain a license

---

[12] The complaint also alleges that when the Mission proceeds with construction, "a portion of the Headquarters will unlawfully encroach onto the Harvey's property."  ¶ 52.  As the trespass has not yet occurred, this claim is not ripe.

to enter the Harveys' property,[13] the Mission's failure to do so does not equate to a direction to the contractors to trespass.  Therefore, the Harveys have failed to state a claim for trespass against the Mission, and the tortious activity exception as to trespass does not apply.

In sum, the Mission is not entitled to immunity, as the Harveys have stated a claim for negligence and nuisance, triggering the tortious activity exception to the FSIA.  While the Harveys have not stated a claim as to trespass, the Mission is nonetheless stripped of its immunity.

### B.  Failure to State a Claim

As explained above, the Harveys have stated a claim as to negligence[14] and nuisance, but not trespass.[15]  Therefore, the trespass claims against the Mission are dismissed.

### C.  Inviolability Doctrine

The Mission lastly argues that the Court has no power to issue an injunction against Sierra Leone relating to activities undertaken in its Permanent Mission due to the Vienna Convention on Diplomatic Relations, signed by the United States on December 13, 1972, which

---

[13] The Court does not find this to be the case, as the provision reads in part:

> "The responsibility of affording any license to enter adjoining property shall rest upon the owner of the adjoining property involved; and in case any tenant of such owner fails or refuses to permit the owner to afford such license, such failure or refusal shall be a cause for the owner to dispossess such tenant through appropriate legal proceedings for recovering possession of real property."

Building Code Section 3309.2.  Therefore, the provision would actually require the Harveys to grant license to the Mission.  The Harveys' suggested reading, that it is the Mission's responsibility to obtain license from them, does not make sense in light of the second clause discussing the adjoining property's tenant.

[14] As to the six provisions with non-delegable duties only.

[15] The Second Circuit has highlighted the fact that analysis of the tortious activity exception overlaps with merits inquiries into the sufficiency of a claim.  *See Robinson v. Gov't of Malaysia*, 269 F.3d 133, 142 (2d Cir. 2001); *see also Namibia*, 681 F.3d 103, 108 n.24 (2d Cir. 2012).

establishes the inviolability of diplomatic premises.  *See* The Vienna Convention on Diplomatic

Relations, *done* Apr. 18, 1961, 23 U.S.T. 3227.  Specifically, Article 22 provides:

1. The premises of the mission shall be inviolable.  The agents of the receiving State may not enter them, except with the consent of the head of the mission.

2. The receiving State is under a special duty to take all appropriate steps to protect the premises of the mission against any intrusion or damage and to prevent any disturbance of the peace of the mission or impairment of its dignity.

3. The premises of the mission, their furnishings and other property thereon and the means of transport of the mission shall be immune from search, requisition, attachment or execution.

*Id.*

In interpreting the Vienna Convention's application to diplomatic premises, the Second

Circuit has stated that Article 22 was intended to create "broad mission inviolability" without

exception.[16] *767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United

Nations*, 988 F.2d 295, 298 (2d Cir. 1993).  The goal of this provision was to protect American

missions abroad from incursions that would be legal under a foreign state's law.  *Id.* at 300.

Therefore, U.S. authorities do not enter protected premises without permission to conduct health

and building safety inspections, even if there are bomb threats.  *Id.* at 301.  Accordingly, in

*Zaire*, the Second Circuit concluded that a district court could not grant immediate possession of

the Zaire Mission after plaintiffs were granted summary judgment on their claim that Zaire

defaulted on its rental payments.  *Id.* at 302.  However, the Vienna Conventions presented no

obstacle to an award of damages.  *Id.* at 303.  Therefore, the inviolability doctrine under the

---

[16] There are some exceptions to inviolability doctrine set forth in Article 31, but these are not relevant to the present case because they relate to personal activities not carried out on behalf of the sending state.  *See 767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United Nations*, 988 F.2d 295, 298 (2d Cir. 1993)

Vienna Convention creates a prohibition against physical entry into diplomatic premises.  The

Mission argues that it thus prevents this Court from entering the injunctive relief requested.

The Mission does not argue, as the Harveys suggest, that this renders them immune from

suit.  However, the Harveys dispute that they are seeking to enter the Mission's premises.

Instead, they characterize their requested injunctive relief as seeking the Mission's compliance

with the Construction Code.

If such compliance could be achieved without compromising the Mission's inviolability,

the Court sees no reason why such an injunction could not be entered.  Indeed, the Court has

already entered a consent order in this matter between the Harveys and defendants Empire and

Montesi, before the Mission was served or appeared.  Doc. 38.  A portion of that order, which is

still active, directed defendants to remove debris from inside the Mission's property, to enclose

the open elevator shaft, and to weatherproof the property.  *Id.*  However, the order stated that

defendants need only "make reasonable best efforts to obtain the necessary approvals or

authorizations from the Mission" and that they would not be prejudiced or held at fault if the

Mission failed to act or provide authorizations required for defendants to comply with the order.

*Id.*  At the most recent conference, the Mission indicated that it has consented to Empire's entry

on the premises for purposes of complying with that order.  Should the Harveys prevail, similar

injunctive relief could plausibly be crafted to respect the inviolability doctrine, and the Mission

has provided no support for their assertion that all injunctive relief is prohibited.  Therefore, the

Court does not find that injunctive relief is entirely barred by the doctrine of inviolability.

## IV.    MOTION FOR CONTEMPT AND SANCTIONS

The Harveys filed a motion for contempt and sanctions against the Empire defendants on

December 14, 2021.  The Harveys allege that the Empire defendants failed to comply with the

consent order by failing to install a chimney extension, failing to prove removal of flammable

debris, failing to properly enclose an open elevator shaft allowing carbon monoxide to enter the

Harvey home, failing to secure the party wall, and failing to properly weatherproof the property.

As for sanctions, the Harveys seek (1) a $50 fine per day for every day the Empire defendants

are noncompliant, beginning September 1, 2021; (2) disgorgement of funds paid by the Mission

from September 1, 2021 to present; and (3) reasonable attorneys' fees and costs as a result of

prosecuting the motion.

## A.  LEGAL STANDARD

A court may hold a party in civil contempt for failing to comply with a court order "if (1)

the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of

noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to

comply in a reasonable manner.  It need not be established that the violation was willful."

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645,

655 (2d Cir. 2004) (internal quotation marks and citations omitted).  The moving party must

establish the three elements with clear and convincing evidence.  *See Latino Officers Ass'n City

of New York, Inc. v. City of New York*, 558 F.3d 159, 164 (2d Cir. 2009).

As to sanctions, "[c]ivil sanctions have two purposes:  to coerce compliance with a court

order and to compensate a plaintiff."  *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 101 (2d

Cir. 2016).  Civil contempt sanctions must be "remedial and compensatory" rather than

punitive.  *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 5 (2d Cir. 1989).

Before imposing coercive sanctions in the form of fines, the court must consider "(1) the

character and magnitude of the harm threatened by the continued contumacy; (2) the probable

effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's

financial resources and the consequent seriousness of the burden of the sanction upon him." *Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 110 (2d Cir. 1987).  Compensatory damages, on the other hand, are "meant to make reparation to the injured party and restore the parties to the position they would have held had the injunction been obeyed." *Broker Genius Inc. v. Seat Scouts LLC*, No. 17 Civ. 8627 (SHS), 2019 WL 2462333, at *2 (S.D.N.Y. June 13, 2019) (internal quotation marks and citations omitted).  Therefore, the amount "must be calibrated to the actual injuries inflicted on the victims of the contumacious conduct[,] . . . [and] the moving party must demonstrate a causal connection between the contemnor's contemptuous behavior and the alleged damages." *Id.* (internal quotation marks, citations, and alterations omitted).  Courts may also award "the reasonable costs of prosecuting the contempt, including attorneys' fees, if the violation . . . is found to have been willful." *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979).

## B. DISCUSSION

The Harveys first argue that the consent order is clear and unambiguous, particularly because the Empire defendants helped draft the order.  The Empire defendants do not refute this, so the first element is satisfied.

Next, the Harveys argue that there is clear and convincing evidence proving noncompliance.  Specifically, a declaration from Matthew Bendix, their engineer, Doc. 140-3, explains that many of the tasks required by the order are incomplete.  Mr. Bendix states that he has "personal knowledge" of these facts.  Doc. 140-3 ¶ 2.  In response, the Empire defendants point out that Mr. Bendix offers no detail to prove that he personally witnessed or confirmed the information in his declaration, and there are no photographs, documents, or other materials to confirm his representations.  Montesi also submitted a declaration responding to each of

Bendix's assertions above.  Doc. 153.  Lastly, the Empire defendants submitted email discussions regarding certain of the disputed items.  The Court will address each alleged deficiency in turn.

### 1.  Chimney Extension Plans

The consent order required the Empire defendants to send plans to the Harveys for their approval to install a temporary chimney extension to avoid carbon monoxide poisoning from the current position of the chimney by June 11, 2021.  Doc. 38 at 1.  It also required them to file plans for the extension with the DOB within three business days of the Harveys' approval, and to construct the extension within three business days of DOB's approval.  *Id.*

Bendix stated that these tasks were not completed, as the Harveys never received plans and Bendix himself provided plans to expedite construction at no cost to the Empire defendants. Doc. 140-3 ¶ 4.  Further, he states that while the Empire defendants wished to retain him to complete the work, they have not installed the chimney extension to date.  *Id.*  In response, Montesi states that the parties mutually agreed that Mr. Bendix would prepare the plans and submit them to DOB for approval at Empire's cost.  Doc. 153 ¶ 7.  Further, he alleges that the delay is mostly caused by Mr. Bendix, as there were several long stretches of time where he was supposedly working on the extension but was not in touch, prohibiting the Empire defendants from obtaining a work permit or beginning work because the plans first need to be approved by DOB.  *Id.*  Specifically, on July 27, 2021, the Empire defendants paid Bendix a $1,000 retainer fee for preparing and filing the plans.  *Id.*; Doc. 153-2.  However, they heard nothing more until October 19, 2021, when they received the plans through counsel, which had not yet been submitted to DOB.  Doc. 153 ¶ 7; Doc. 153-3.  Then in late November, Bendix asked for further payment, to which Montesi replied on December 7, 2021 asking for proof that the plans had been

filed with DOB.  Doc. 153 ¶ 7.  Bendix replied the same day stating that the filing had been initiated and they would then start "uploading documents and getting the rest of the information organized," but would need the balance of payment before submitting the filing.  *Id*.; Doc. 153-4. The Empire defendants paid the full balance in December.  Doc. 153 ¶ 7.  Montesi was then informed on December 20, 2021 by his counsel that Bendix had completed filing of the permit application and supporting documents with DOB but not the final drawings.  Doc. 153 ¶ 7.

In the Court's view, this history presents clear and convincing evidence that the Empire defendants are not in compliance with the requirement to provide plans for the chimney extension and submit them for DOB approval, as they clearly did not do so by the deadlines in the consent order and there is no evidence of diligent efforts to comply by the deadline. However, the Court will not order compliance, as it appears that the Harveys assumed responsibility for the requirements and have already drafted plans and are in the process of obtaining DOB approval.  Further, while the Empire defendants are not in compliance with the further requirement to build the extension, they cannot do so without approved plans, and Bendix and the Harveys took over that approval process at the Empire defendants' expense.  Without approval from the DOB, which is contingent on approval of Mr. Bendix's plans, the Empire defendants cannot act.  Therefore, the Court will not hold them in contempt for that portion of the contempt order at this time.

### 2.  **Debris Removal**

The consent order also required the Empire defendants to remove debris posing a fire hazard from the site by June 4, 2021.  Doc. 38 at 2.

The Harveys argue that the status of this requirement is "unknown" at this time because older photographs of part of the property do not show compliance, and the Mission's lawyers

have refused to take current photographs or allow inspection.  Doc. 140-3 ¶ 4.  The Mission has

similarly refused to submit an affidavit certifying compliance as requested by the Harveys.  *Id.*

The Empire defendants respond that, while a stop-work order from DOB was once in place

related to the presence of such debris, the stop work order was lifted on August 4, 2021, as

evidenced by a photograph of the recission notice, Doc. 153-5.  The Harveys argue that this does

not prove compliance, particularly because the DOB's website still shows an active stop work

order with unpaid fines as of February 28, 2022, with the last action being a failed inspection on

July 14, 2021.  Doc. 162-2.

The Court finds that while there are discrepancies between the DOB website and the

physical order showing that the stop work order was rescinded, the Harveys have not provided

clear and convincing evidence that the debris has not been removed as required.  Therefore, the

Court will not hold the Empire defendants in contempt for failure to comply as to these

requirements.

### 3.  Entry and Egress

The consent order next requires the Empire defendants to ensure proper entry and egress

from the street to and from the roof of the Mission's headquarters.  Doc. 38 at 2.  Mr. Bendix

describes the status of this requirement as "unknown."  Doc. 140-3 ¶ 4.  The Empire defendants

respond that there is adequate access, and if there were not, DOB would have issued a violation

or stop work order.  Doc. 153 ¶ 14.  As the Harveys have put forward no evidence showing

noncompliance as to this portion of the order, the Empire defendants are not in contempt.

### 4.  Enclosing Elevator Shaft

Lastly, the consent order requires the Empire defendants to enclose any openings in the

elevator shaft upon the DOB stop work order being lifted.  Doc. 38 at 2–3.  Bendix states that

this work is not completed.  Montesi responds that "[t]he shaft is enclosed and there are no penetrations to report."  Doc. 153 ¶ 15.  Again, with no evidence other than Bendix's declaration, the Court will not hold the Empire defendants in contempt for this portion of the consent order.

### 5. Sanctions

The Harveys request the following sanctions:  (a) a $50 fine per day for every day the Empire defendants were noncompliant with the consent order beginning September 1, 2021; (b) disgorgement of funds paid to the Empire defendants from the Mission from September 1, 2021 to present; and (c) reasonable attorneys' fees and costs for the Harveys' motion.  As the Empire defendants are not in compliance with respect to only two provisions of the consent order related to the chimney extension plans and the Harveys mitigated any damages associated with that issue by negotiation to have Bendix prepare and submit the plans instead, the Court does not find that a daily fine would be an appropriate sanction.  As to disgorgement, the Empire defendants have represented that they have not received any payment since September 1, 2021, so there is no money to disgorge.  Doc. 153 ¶ 34.  Lastly, as to attorneys' fees and costs, courts in this district typically only award such sanctions upon a showing of willfulness. *Jacobs v. Citibank, N.A.*, 318 F. App'x 3, 5 n.3 (2d Cir. 2008).  The Harveys have made no arguments as to the willfulness of the two missed chimney extension deadlines, so the Court will not award sanctions at this time.  However, the Empire defendants are admonished that any future failure to timely comply with court orders could be subject to the imposition of sanctions.

### V.  PRELIMINARY INJUNCTION

The Harveys move for a preliminary injunction requiring all the defendants to (1) show cause why a preliminary injunction should not issue related to continual damage to the Harveys' home; (2) install appropriate flashing and refrain from conducting work on the Mission causing

water damage to the Harveys' home; (3) comply with Building Code Section 3309.8(3) and (5) and fill gaps in the party wall within thirty days of the order; (4) comply with Building Code Sections 3309.8 by constructing a gutter and installing flashing within thirty days of the order; (5) comply with Mechanical Code Sections 801.1.1.1, 801.1.1.2, and 901.1.1.3 and extend chimney flues on the Harveys' home within thirty days of the order; and (6) provide a schedule for completion of renovations in accordance with Building Code Section 3309.1.1 within five days of the order.  The Harveys also request appointment of an independent monitor with costs split jointly and severally among the defendants to monitor compliance.

## A. LEGAL STANDARD

"A party seeking a preliminary injunction must ordinarily establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest." *Demirayak v. City of New York*, 746 F. App'x 49, 51 (2d Cir. 2018) (summary order) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)).  Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction."  *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir. 1983).  However, the movant must show both irreparable harm and "either a likelihood of success on the merits *or* sufficiently serious questions going to the merits *and* a balance of hardships tipping decidedly toward the moving party." *L.S.S. Leasing Corp. v. U.S. Gen. Servs. Admin.*, 579 F. Supp. 1565, 1568 (S.D.N.Y. 1984) (citations omitted) (emphasis in original).  Irreparable harm exists "where there is a threatened imminent loss that will be very difficult to quantify at trial."  *Ins. Co. of the State of Pa. v. Lakeshore Toltest JV, LLC*, No. 15 Civ. 1436 (ALC), 2015 WL 8488579, at *2 (S.D.N.Y. Nov. 30, 2015) (internal quotation marks and citation omitted).  Therefore, preliminary

injunctions generally are not issued "where monetary damages may provide adequate compensation[.]" *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995). Further, where multiple claims are presented, plaintiffs "need not show . . . a likelihood of success on the merits of all of [their] claims" as long as they show a likelihood of success as to at least one of the claims. *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 618 (S.D.N.Y. 2018) (alterations and quotation marks omitted).

The movant has an even higher burden when seeking a mandatory preliminary injunction that "either alters the status quo or would provide the ultimate relief sought in the underlying action." *Demirayak*, 746 F. App'x at 51 (citing *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)). Under this heightened standard, the plaintiff must make a clear showing that he is entitled to the relief requested, or that "extreme or very serious damage" will result from denial of preliminary relief. *Nicholson v. Scoppetta*, 344 F.3d 154, 165 (2d Cir. 2003) (internal citations omitted); *see also Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) ("The burden is even higher on a party . . . that seeks 'a mandatory preliminary injunction that alters the status quo by commanding some positive act, as opposed to a prohibitory injunction seeking only to maintain the status quo.'" (quoting *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010))).

## B. DISCUSSION

### 1. Irreparable Harm

The Harveys argue that without a preliminary injunction, they will suffer irreparable harm due to both the unauthorized interference with their real property interests and the unquantifiable interest they have in their family home. *See Brooklyn Heights Ass'n, Inc. v. Nat'l Park Serv.*, 777 F. Supp. 2d 424, 435 (E.D.N.Y. 2011) (stating that unauthorized interference

with real property rights is irreparable harm as a matter of law).  Specifically, they argue that

they have suffered irreparable harm over the last seven months as evidenced by three instances

of harm.  First, a tarp the Empire defendants placed over the elevator shaft allegedly fell over and

covered the Harveys' chimney, causing carbon monoxide to enter their home.  Second, the

Empire defendants placed plywood over a smoke vent on the Harveys' roof, preventing a fire

safety vent from opening before Mr. Harvey discovered and removed the plywood.  Third, water

intrusion has occurred, particularly during winter months when snow melts.  Thus, the Harveys

allege that they "fear for their safety" in their home.

        The Mission responds that the harms alleged above are not actual and imminent.  *See*

*Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) ("The movant must

demonstrate an injury that is neither remote nor speculative, but actual and imminent[.]")

(quoting *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995)).  The Mission argues

that the tarp and plywood incidents have been remedied and therefore cannot support injunctive

relief, and there are no other current actual injuries to support relief.  Further, the Mission argues

that even if the harms did come to pass, they could be remedied by money damages.  For

example, damage from water intrusion, including mold, can be compensated through monetary

damages.  *See, e.g.*, *Kofinas v. Fifty-Five Corp.*, No. 20 Civ. 7500 (JSR), 2021 WL 603294, at *4

(S.D.N.Y. Feb. 16, 2021) (stating that monetary damages would redress water damage).  Lastly,

the Mission argues that injunctive relief directed at the Mission, as opposed to the contractor

defendants, is inappropriate as it was the contractor defendants' conduct that underlies the

Harveys' concerns.

        The Mission is incorrect that it bears no responsibility for the alleged damages.  As

explained above, the Mission, as the owner of the building, is responsible for certain non-

delegable duties as set out in the building and construction codes.  However, the Court agrees with the Mission that the Harveys have not demonstrated irreparable harm as they have not identified actual imminent threats that cannot be remedied through monetary damages.  While the Harveys summarily allege that defendants are "interfering with [their] ability to use and enjoy their home," Doc. 162 at 19, they have not identified any ways in which that interference is actively occurring.  Indeed, at the most recent conference with the parties, counsel for the Harveys represented that the Harveys are still living in the home.  Without irreparable harm, the Court cannot order a preliminary injunction, so the Harveys' motion is denied.[17]

## VI.    CONCLUSION

For the foregoing reasons, the Mission's motion to dismiss is DENIED.  The Harvey's motion for contempt and sanctions is DENIED in large part as described above, and the motion for a preliminary injunction is DENIED.  The parties are directed to appear for a telephonic status conference on July 15, 2022 at 11:30 a.m.  The parties are directed to dial (877) 411-9748 and enter access code 3029857# when prompted.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 138 and 140.

It is SO ORDERED.

Dated:    July 1, 2022
          New York, New York

_____

Edgardo Ramos, U.S.D.J.

---

[17] The Court notes that it received a letter from the Harveys on June 27, 2022 in which they allege that "a significant rat infestation has invaded [their] home from the headquarters, which remains dormant." Doc. 168.  However, as the issue has not been fully briefed by the parties and the Court is not otherwise granting injunctive relief, the Court does not reach this issue at this time.  Further, the Mission indicated in a responsive letter on June 28, 2022 that it had retained an exterminator to inspect the property on June 29, 2022.  Doc. 169.